**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**GEMMA ELISABETH SWATMAN** *
**25 Wilson Street**
**St. Paul's** *
**Bristol**
**BS2 9HH** *
**England**
**United Kingdom** *

**Petitioner,** *

* **Civil No.:**
**v.**
*
**MICHAEL JAMES HICKS**
**1241 C Street, S.E.** *
**Washington, D.C. 20003**
*
**Respondent.**

* * * * * * * * * * * * *

**VERIFIED PETITION FOR RETURN OF CHILD TO ENGLAND**
**AND ISSUANCE OF SHOW CAUSE ORDER**

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

## INTRODUCTION

1. Petitioner, Gemma Swatman (the "Mother"), by and through her undersigned *pro bono* attorneys, files this Verified Petition for Return of Child to England (hereinafter "Petition"), against the Respondent, Michael James Hicks (the "Father"). This Petition is filed as a result of the wrongful retention of the child, A.-J. L. H., born in 2014, in the United States from his habitual residence of England. The wrongful retention began on or about May 14, 2017.

2. This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

3. The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and the United Kingdom, which includes England, on July 1, 1988.[3]

4. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

**JURISDICTION**

5. This Court has jurisdiction under ICARA § 9003 because this case involves the wrongful removal of a child under the age of sixteen to the United States from the child's habitual residence of England. Upon information and belief, the child is currently located within the jurisdiction of this Court in the District of Columbia.

**FACTS**

6. The Mother is a citizen of the United Kingdom and has lived her entire life in England.

7. Upon information and belief, the Father is a citizen of the United States.

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,493 (1986), text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction (last accessed March 5, 2018).

[2] 22 U.S.C. 9001 *et seq*. (2017).

[3] *See* Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/childabduction/en/country/hague-party-countries.html (last accessed March 5, 2018).

8. The Mother and Father have never been married. They first met online on Instagram, and then met in person when the Father travelled to England to visit with the Mother.

9. The parties began a long distance dating relationship. They spent time together in England when the Father travelled to England to be with the Mother and to work on his career as a musician.

10. The Mother has never lived in the United States. She has only ever travelled to the United States for short periods of time as a visitor under the ESTA visa waiver program for vacations with the Father, and to visit the Father's family in the Washington D.C. metropolitan area.

11. The parties are the parents of two children together. Their first child together is A.-J. L. H., born in 2014, who is the subject of this Petition. The child was born in England. After the child's birth in England, he has always lived with the Mother at her home in England and visited with the Father in England.

12. The parties are also the parents of a second child together, A.C.H., born in 2016. A.C.H. is not the subject of this Petition. A.C.H. was also born in England and has also always lived with the Mother at her home in England. A.C.H. is in England with the Mother and has never travelled to the United States. A.C.H. is therefore not the subject of this Petition.

13. The Mother also has an older child from a previous relationship. The Mother's oldest child is A.D., born in 2009. A.D. was also born in England and has also always lived with the Mother at her home in England. A.D. is in England with the Mother and therefore is not the subject of this Petition.

14. The Mother and her three children, including the child at issue in this case, have always lived together at the Mother's home in England.

15. The family has never lived in the United States. The Mother and her three children, including the child at issue here, are not United States citizens and have no immigration status that would permit them to live in the United States.

16. From the time of A.-J. L. H.'s birth in 2014, he has always lived in England with the Mother and spent time with the Father in England.

17. A.-J. L. H. also regularly spends time with his two siblings and his extended family and friends in England.

18. A.-J. L. H. receives medical care in England through the United Kingdom's comprehensive national healthcare system. A.-J. L. H. has had a primary care physician in Canada since his birth in 2014.

19. A.-J. L. H. is fully involved and immersed in day to day family life and cultural life in England and has been since the time of his birth.

20. The Mother receives a monthly child benefit from the government of the United Kingdom. This payment is a benefit available to parents residing in the United Kingdom. It is not a "low-income" benefit payment. The Mother has of course now notified the government of the United Kingdom that the child is temporarily outwith the United Kingdom.

21. There have been no child custody proceedings between the parties in England or anywhere else in the world. Although the parties have never been married and do not live together, they have always been able to agree on contact time for the Father to spend with A.-J. L. H., without the need for any court intervention.

22. In early 2017, the Father asked the Mother if she would agree for A.-J. L. H. to travel with him to the District of Columbia for a three-month visit with the Father's family.

23. The Mother agreed for A.-J. L. H. to travel with the Father to the District of Columbia for three months to visit the Father's family. The Mother and Father agreed that the

Father and A.-J. L. H. would travel from England to the United States on February 15, 2017 and that the Father would return A.-J. L. H. to his home in England on May 14, 2017.

24. The parties also agreed to divide the cost of A.-J. L. H.'s round-trip travel between England and the United States. The Father paid for A.-J. L. H.'s airline ticket for travel from England to the United States. The Mother paid for A.-J. L. H.'s airline ticket for travel back home to England from the United States.

25. The Father told the Mother that A.-J. L. H. would be with the Father at his home in the District of Columbia for the duration of the three-month visit.

26. The parties cooperated to obtain ESTA visa waiver permission for A.-J. L. H. to enter the United States as a visitor for up to 90 days. The child does not have United States citizenship, and does not have any other visa that would allow the child to stay in the United States beyond a 90-day visit.

27. The Mother and Father have never once discussed or agreed on A.-J. L. H. staying in the United States beyond the 90-day visit. They have never discussed or agreed on A.-J. L. H. living anywhere other than England.

28. The Father and A.-J. L. H. travelled to the United States from England on February 15, 2017 as planned.

29. After the Father and A.-J. L. H. arrived in the United States, the Father initially kept in contact with the Mother. The Father told the Mother that he was lives in the District of Columbia and that he and the child were located in the District of Columbia. The Father also told the Mother that he works as a freelance musician, and that to supplement his income, he also works as a bartender at Sandovan Restaurant and Lounge, located at 4809 Georgia Avenue, N.W., Washington, D.C. 20010.

30. The Father also provided the Mother his District of Columbia telephone number, (202) 274-2485, as the contact number for the Mother to reach the Father and A.-J. L. H. during the visit to the United States.

31. Shortly after the Father and A.-J. L. H. arrived in the District of Columbia, however, the Father stopped communicating with the Mother and cut off all communication between the Mother and A.-J. L. H. The Father stopped answering the Mother's calls, and stopped responding to her voicemail messages and text messages.

32. As May 14, 2017 (the date the child was to return to England) approached, the Mother became increasingly anxious about the Father's refusal to communicate with her. The Mother therefore called the Father repeatedly and left him numerous messages attempting to speak to the Father to prepare for the child's return home to England.

33. The Father finally did respond to the Mother's messages, and told her that he would not be returning A.-J. L. H. to his home in England on May 14, 2017. Instead, the Father told the Mother that he needed additional time to save money to purchase airline tickets for himself and the child to travel back to England.

34. This communication from the Father did not make sense to the Mother because she had already seen the round-tip airline tickets for the Father and child to travel back to England on May 14, 2017.

35. On May 14, 2017, the Father did not return the child home to England.

36. The Mother repeatedly tried to reach the Father by telephone and text message, and through the Father's friends and family, in an effort to resolve the matter with the Father directly and to have the Father return the child home to England without the need for any court or law enforcement involvement.

37. The Father refused to answer any of the Mother's calls and did not return any of her messages.

38. The Father has prevented all contact between the Mother and child from May 14, 2017 until the present. The Father has prevented all contact between the child and the child's siblings for the same period of time.

39. When the child was not returned home to England on May 14, 2017, and the Father refused to communicate with the Mother, and refused to resolve the matter directly with the Mother, the Mother began researching the legal remedies available to her to seek the return of the child to England.

40. The Mother had no previous experience with any litigation or with any other law enforcement matter, and therefore did not know where to start or from whom she should seek assistance. The Mother does not have the financial means to pay for legal advice. She therefore believed she had no alternative but to conduct her research herself, while simultaneously continuing to attempt to reach the Father to resolve the matter with him directly.

41. After conducting research on the remedies available to her, the Mother ultimately learned about the Hague Convention and the remedies available through the Convention.

42. The Mother then submitted her Hague Convention Application for Return to the Canadian Central Authority in England in accordance with the Convention, seeking return of the child to England from the District of Columbia.

43. The Mother's Hague Convention Application for Return has been transmitted by the Central Authority for England and Wales to the United States Department of State Office of Children's Issues (the United States Central Authority).

44. The Mother has also now made a police report of the Father's wrongful retention of the child to the Avon & Somerset Constabulary, her local law enforcement agency in Bristol, England.

45. The Avon & Somerset Constabulary have an active open case against the Father for child protection and safeguarding issues. The police file number is 5217-137-207. The officers assigned to the case are PC Emily Green #4675 and PC Lorna Haddrell #4393. The telephone contact number for the two officers assigned to the case is 011-44-780-287-5052, which is the Constabulary's hotline telephone number that can be dialed to reach the two assigned officers.

46. On February 25, 2018 and March 1, 2018, the Father contacted the Mother by text message. He contacted her from a District of Columbia telephone number (202) 274-0681. In the text messages, the Father told the Mother that he would be bringing the child home to England "soon."

47. The Mother does not have the financial means to pay for counsel in the District of Columbia to represent her in filing a Petition for Return. The Mother therefore searched for *pro bono* counsel to represent her in this matter in the District of Columbia. The Mother has now retained undersigned counsel to represent her on a *pro bono* basis in this matter, and now files her Petition for Return.

48. Upon information and belief, the child is currently physically located with the Father at 1241 C Street, S.E., Washington, D.C. 20003.

49. Before the Father travelled with the child to the United States, he told the Mother that he lived in the District of Columbia, and that the child would be staying with him in the District of Columbia for the duration of the visit. But the Father did not give the Mother his exact address in the United States.

50. Undersigned counsel therefore sought assistance of the United States Department of State Office of Children's Issues, in its capacity as the Central Authority, in locating the Father's exact address within the District of Columbia.

51. The Central Authority was able to provide undersigned counsel with two addresses for the Father: (A) 1241 C Street, S.E., Washington, D.C. 20003; and (B) 858 N. 44th Street, Philadelphia, Pennsylvania 19104. Upon information and belief, the Central Authority is not permitted to provide any additional information, including its basis for determining that the Father is located at either of the two addresses provided.

52. Undersigned counsel therefore arranged for an independent investigation into the current whereabouts of the Father and child, to determine whether to file the Mother's Petition in the District of Columbia or the Commonwealth of Pennsylvania. The independent investigation determined that:

A. The Father does not have a driver's license in the United States;

B. The Father has been employed at Sandovan Restaurant and Lounge, located at 4809 Georgia Avenue, N.W., Washington, D.C. 20010;

C. The Father has a District of Columbia telephone number, (202) 274-2485, which is operational and which the Father answered when the number was called;

D. The Father has a second District of Columbia telephone number, (202) 274-0618, which is operational and which the Father used to send the Mother text messages on February 25, 2018 and March 1, 2018;

E. The owner of the property located at 1241 C Street, S.E., Washington, D.C. 20003 (the address provided by the Central Authority) is Michael Lawson. Mr. Lawson is a member of the Father's extended family;

F. The Father's sister, Ingrid F. Bynum (a/k/a Ingrid Reynolds Lawson), has previously lived at the property located at 1241 C Street, S.E., Washington, D.C. 20003 (the address provided by the Central Authority). She now lives in the Washington, D.C. metropolitan area, in Alexandria, Virginia and is the School Principal of Patrick Henry Elementary School, located in Alexandria, Virginia.

53. The independent investigation did not reveal any information supporting a determination that the Father and child are located in Philadelphia at the alternative address provided by the Central Authority.

54. The Father's family, friends, and support network are all located in the Washington, D.C. metropolitan area. The Father has been employed in the District of Columbia. The Father has an active District of Columbia telephone number. The Father told the Mother that he lives in the District of Columbia and that the child would be with the Father at his home in the District of Columbia for the duration of the child's visit to the United States.

55. Upon the information and belief set forth above, the Father and child are currently located at 1241 C Street, S.E., Washington, D.C. 20003.

56. The Mother and Father never had a shared intent for the child to live anywhere other than England.

57. The parents' only shared, settled intent with respect to the child's habitual residence has always been that the child resides in England.

58. England is the child's ordinary home and holds a degree of settled purpose from the child's perspective. The child has lived in England for his entire life.

59. The child is fully involved and integrated in all aspects of daily and cultural life in England. The child has siblings, extended family, and very close friends in England. The child also receives routine medical care in England.

60. At the time of the Father's wrongful retention of the child on May 14, 2017, the Mother had (and continues to have) rights of custody to the child under English law by operation of law as fully set forth in Section II below.

61. The Mother has continuously exercised her custody rights by making decisions regarding the child's welfare and providing the child's day-to-day care since the child's birth.

62. The Father's action in removing the child to the United States from his habitual residence of Canada is in direct violation and breach of the Mother's rights of custody.

63. The Mother never consented to the child living in the District of Columbia, or anywhere other than England.

64. The Mother has not acquiesced in the Father's retention of the child in the District of Columbia from England.

**COUNT I – WRONGFUL RETENTION**

65. The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 64 as if fully set forth herein.

66. The Convention applies to cases in which a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the children.

67. The child in this case is under the age of 16.

68. The habitual residence of the child is England. The child is fully involved in all aspects of daily family life and cultural life in England. The parents last shared and settled intent

was for the child to live in England. The child has lived his entire life in England. England is the child's ordinary home and holds a degree of settled purpose from the child's perspective.

69. At the time the Father wrongfully retained the child in the United States, the Mother had (and continues to have) rights of custody to the child under English law by operation of law under the Children Act 1989.

70. Part 1, Section 3(1) of the Children Act 1989 defines "parental responsibility" as "all the rights, duties, powers, responsibilities and authority which by law the parents of a child have in relation to the child and his property."

71. Part 1, Section 2(2) of the Children Act 1989 (as amended in 2003) provides that "[w]here a child's father and mother were not married to each other at the time of his birth, (a) the mother shall have parental responsibility for the child; (b) the father shall have parental responsibility for the child if he has acquired it (and has not ceased to have it) in accordance with the provisions of this Act."

72. In summary, in accordance with the Children Act 1989 Part 1, Section 4, a father may acquire parental responsibility by being registered as a child's father on the child's birth certificate.

73. The Mother here therefore has joint parental responsibility for the child as defined by the Children Act 1989. She has this right by operation of law even without any orders being entered related to the child by any courts of the United Kingdom, and she had this right at the time the Father retained the child in the District of Columbia from England.

74. Joint parental responsibility is considered a "right of custody" under Article 5(a) of the Hague Convention.

75. At the time the Father wrongfully retained the child in the United States, the Mother was exercising her custody rights within the meaning of Articles Three and Five of the

Convention by caring for the child, fully participating in the child's life, and undertaking all parenting responsibilities since the child was born.

76. Notice is given in this pleading that the Mother is relying upon foreign law. Fed.R.Civ.P. 44.1.

77. The Mother has requested the return of the child to England by submitting an Application for Return with the Central Authority for England and Wales.

78. The Mother has never acquiesced or consented to the retention of the child from in United States from England.

79. The Mother has promptly taken all legal steps available to her to seek the return of the child to England.

80. Upon information and belief, the child is currently physically located within the District of Columbia at 1241 C Street, S.E., Washington DC 20003 with the Father.

**COUNT II – ARTICLE 18 RETURN**

81. The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 80 as if fully set forth herein.

82. The Mother invokes Article 18 of the Convention, which grants this Court plenary power to order the child's return at any time.[4]

**PROVISIONAL AND EMERGENCY REMEDIES[5]**

[4] *See* Convention, art. 18; *see also* 51 Fed. Reg. 10,494, 10,509 (1988) (legal analysis of the Hague Convention by the U.S. Department of State); *In re B. Del C. S. B.*, 559 F.3d 999, 1015-16 (9th Cir. 2009); *Alcala v. Hernandez*, 826 F. 3d 161 (4th Cir. 2016).

[5] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." ICARA § 9004.

83. Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." ICARA § 9004. In this case, the law referred to is that of the District of Columbia. In the District of Columbia, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified as the D.C. Code Ann. § 16-4601.01 *et seq*. District of Columbia law addresses the appearance of the parties and the child in such cases in § 16-4601.10. That section authorizes this Court to order the appearance of the child and custodian or custodians. *Id.* This Court therefore has the authority to issue a show cause order, ordering the appearance of the Mother in that the provisions of 22 U.S.C. § 9004 can be met.

84. The Mother further requests that this Court issue along with the Show Cause Order, an Order prohibiting the removal of the child from the jurisdiction of this Court during the pendency of the proceedings in this Court, an Order taking into safe-keeping all of the child's travel documents, an Order setting an expedited Initial Show Cause and Scheduling Hearing on the first available day on the Court's docket, and thereafter an Order setting an expedited hearing on the Verified Petition for Return of Child to England.[6]

85. The Mother further requests that she be excused from attending the Initial Show Cause and Scheduling Hearing. The Mother does not have sufficient financial resources to travel to the United States for both the Initial Show Cause and Scheduling Hearing and for the expedited evidentiary hearing. The Mother's counsel have her full authority to schedule an

[6] Such a Petition may also be treated as an application for a Writ of Habeas Corpus itself. *Zajaczkowski v. Zajaczkowska*, 932 F. Supp. 128, 132 (D.Md. 1996) ("[T]he Court will treat the [Convention] petition as an application for a writ of habeas corpus . . . pursuant to 28 U.S.C.A. § 2243").

expedited evidentiary hearing and all related deadlines at the Initial Show Cause and Scheduling Hearing.

## UCCJEA DECLARATION

86. The details regarding the children that are required to be provided under the UCCJEA are as follows:

a. Upon information and belief, the child has been physically located with the Father at 1241 C Street, S.E., Washington, D.C. 20003 from February 15, 2017 until the present, as a result of the Father's wrongful retention of the child.

b. From birth in 2014 until present, the child has resided with the Mother at 25 Wilson Street, St. Paul's, Bristol, BS2 9HH, England, United Kingdom.

c. The Mother does not have information of any custody proceeding concerning the child pending in any other court of this or any other State, other than the information provided in this Petition.

d. The Mother does not know of any person or institution not a party to the proceedings that has physical custody of the child or claim rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the child.

## NOTICE OF HEARING

87. Pursuant to ICARA § 9003(c), the Father will be given notice of any hearings in accordance with § 16-4602.05 of the UCCJEA.[7]

## ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

88. The Mother has incurred significant expenses as a result of the wrongful removal of the child by the Father. The Mother will submit a copy of all expenditures as soon as

[7] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of the Father's wrongful removal.

89. The Mother respectfully requests that this Court award her all reasonable and necessary expenses and *pro bono* attorneys' fees and costs incurred to date as required by ICARA § 9007, reserving jurisdiction over further expenses.

**RELIEF REQUESTED**

**WHEREFORE**, Petitioner, Gemma Elisabeth Swatman, respectfully requests the following relief:

A. That this Court issue an Order directing the prompt return of the child to his habitual residence of England in accordance with Petitioner's rights of custody under English law and Articles 3, 5*a* and 18 of the Convention; and

B. That this Court issue a Show Cause Order forthwith, scheduling an initial show cause and scheduling hearing on the first available date on the Court's calendar, and requiring the Respondent to appear in person with the child at the show cause and scheduling hearing to confirm that the child is physically located within this Court's jurisdiction; and

C. That this Court's Show Cause Order also include a provision ordering that the child shall not be removed from this Court's jurisdiction during the pendency of these proceedings, and taking into the Court's possession all of the child's passports and any other travel documents; and

D. That this Court's Show Cause Order be served on the Respondent forthwith by the United States Marshal Service; and

E. That this Court excuse the appearance of the Petitioner at the initial Show Cause Hearing as long as the Petitioner's counsel appears on her behalf and has full authority from the Petitioner to schedule an expedited evidentiary hearing and all related deadlines; and

F. That this Court order access for the Petitioner with the child while she is present in the United States for these proceedings; and

G. That if the Respondent fails to appear pursuant to this Court's Show Cause Order with the child, that this Court issue an Order directing that the name of the child be entered into the national police computer system (N.C.I.C.) missing persons section and that an arrest warrant be issued for the Respondent; and

H. That this Court issue an Order directing the Respondent to pay the Petitioner's reasonable and necessary expenses, including, but not limited to, *pro bono* attorneys' fees, suit money, expenses, and; and

I. That this Court grant any such further relief as justice and the Petitioner's cause may require.

**VERIFICATION**

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON MARCH 5, 2018.

______________________________
Gemma Elisabeth Swatman
*Petitioner*

/s/ Kelly A. Powers
Stephen J. Cullen, D.C. Bar No.: 439872
Kelly A. Powers, D.C. Bar No.: 1007106
Miles & Stockbridge P.C.
1500 K Street, N.W., Suite 800
Washington, D.C. 20005
(202) 465-8374 (410) 385-3709 (fax)
kpowers@milesstockbridge.com
scullen@milesstockbridge.com

*Pro Bono Attorneys for Petitioner*